Having reconsidered the competent evidence of record, the Full Commission reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On the date of plaintiffs injury, the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. On 22 September 1999, plaintiff sustained multiple injuries due to trauma including lacerations, a T12 compression fracture, and loss of consciousness due to a concussion.
3. A Form 22 Wage Chart has been requested and will be provided to supplement the evidence offered at the hearing before the Deputy Commissioner.
4. Plaintiffs 16 December 1999 recorded statement is admissible.
5. As a result of the injuries she sustained on 22 September 1999, plaintiff was rendered incapable of earning wages beginning on that date and continuing through the date of the hearing before the Deputy Commissioner.
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. In July 1999, the Town of Yaupon Beach and the Town of Long Beach consolidated to become the Town of Oak Island (hereinafter "defendant Town). These towns and the Town of Caswell Beach are located on the island known as Oak Island. Oak Island has three named beaches, Caswell Beach, Yaupon Beach and Long Beach. After the merger, Yaupon Beach and Long Beach were located within the town limits of defendant Town. Caswell Beach was not located within the geographical limits of defendant Town, but, pursuant to a mutual aid agreement between defendant Town and Caswell Beach, defendant Towns law enforcement and emergency response personnel would respond to emergency calls from Caswell Beach.
2. In June 1998, before plaintiff was hired by defendant Town, plaintiff worked for the Marine Safety Office under the Coast Guard in Wilmington, North Carolina. She also volunteered as the Assistant Chief of the Long Beach Volunteer Rescue Squad (hereinafter "defendant Rescue Squad ").
3. In June 1998, Danny Laughren (identified as "Loren in the transcript of testimony), Chief of Police and coordinator of emergency medical services for defendant Town, offered plaintiff employment as a full-time emergency medical technician (EMT) with defendant Town. As part of the employment offer, plaintiff was required to resign from defendant Rescue Squad. Chief Laughren and defendant Town insisted upon the resignation to avoid any possible violation of the Fair Labor Standards Act, under which defendant Town might be required to pay plaintiff overtime for work she performed for defendant Rescue Squad, which otherwise would be considered voluntary.
4. After plaintiff accepted the offer of employment as a full-time EMT for defendant Town, she resigned from defendant Rescue Squad. In recognition of plaintiffs years of service as a volunteer, defendant Rescue Squad made her an honorary lifetime member, entitling her to all of the benefits of a regular volunteer, including health and life insurance. Honorary lifetime members of defendant Rescue Squad were not expected to respond to calls and did not, therefore, have active duties. Honorary lifetime members of defendant Rescue Squad were usually older, former volunteers whose ability to serve as an EMT was impaired or whose certifications had expired.
5. Defendant Town, through Chief Laughren, prohibited plaintiff from working as a volunteer for defendant Rescue Squad, except for occasions that presented special or extenuating circumstances, i.e., circumstances that constituted an emergency. Before Hurricane Floyd, plaintiff had been allowed to volunteer during one instance involving a bus accident, because there were insufficient emergency personnel to respond. In that instance, or in other special circumstances in which Chief Laughren would allow plaintiff to do what would otherwise be volunteer duty, plaintiff would be paid by defendant Town as an Oak Island EMT. She would not be considered an employee or volunteer of Defendant Rescue Squad.
6. On 14 September 1999, Hurricane Floyd made landfall on the North Carolina coast and left a wake of destruction in its path, especially the townships located on Oak Island. Access to the beaches from roads along Caswell Beach, Yaupon Beach, and Long Beach was restricted. Checkpoints or roadblocks guarded access to each of the beaches. As a result of statewide destruction caused by Hurricane Floyd, former Governor James B. Hunt, Jr., formally proclaimed a state of disaster pursuant to General Statute 166A-4(3). The National Guard was activated to provide assistance. Other relief agencies, including the Salvation Army and the Red Cross, participated in the relief efforts on Oak Island.
7. Before the hurricane hit land, defendant Town issued plaintiff an identity badge which identified her as "a member of the Oak Island Emergency Management Team. Defendant Town issued such a badge to every employee of defendant Town who was "connected with Emergency Management in any way. . . .
8. Plaintiff returned to Oak Island on September 16. From September 16 through September 21, plaintiff worked every day except September 17. Plaintiff worked her regular work shift that began at 6:00 a.m. and ended at 6:00 p.m.
9. Plaintiff returned to work for defendant Town during the recovery period following Hurricane Floyd on 16 September 1999. She and other EMTs employed by the Town performed a variety of tasks to assist in the recovery effort. Plaintiff and the other emergency management team members helped staff roadblocks, patrol the beaches, and deliver food and water to other team members and residents.
10. During their regularly scheduled work hours, plaintiff and the other EMTs were authorized by defendant Town to ride in HMMWV vehicles. The HMMWVs were owned and operated by the National Guard. Plaintiff and the other EMTs were transported in these vehicles so that they could assist in the hurricane recovery effort. Plaintiff and the other EMTs also used vehicles owned by the Town. Chief Laughren knew that plaintiff rode in HMMWVs during her usual working hours while assisting in the recovery effort. After the hurricane, plaintiff and the other EMTs performed duties during their scheduled work shifts that differed significantly from their usual duties for defendant Town.
11. In the evenings after completing her shift for defendant Town, plaintiff went to the Yaupon Beach Fire Station to work as a volunteer for defendant Rescue Squad. As a result of its central location on Oak Island and past practices, the Yaupon Beach Fire Station was used as headquarters for hurricane relief personnel, including employees of defendant Town and other volunteers. At the station, volunteers prepared and served meals to persons involved in the hurricane relief and recovery effort, including National Guardsmen, volunteer firemen, volunteer emergency medical technicians, public service employees from other townships and counties, and private citizens.
12. During the week following Hurricane Floyd, members of defendant Rescue Squad went on patrol with National Guardsmen as well as in vehicles owned by the Town. They also manned checkpoints and roadblocks and delivered food and water to citizens and volunteers. All volunteers, whether ordinary citizens or trained volunteers, received their instructions from various coordinating personnel. The volunteers generally did not receive specific instructions but were told to assist in any way that they could.
13. On 22 September 1999, plaintiff was not scheduled to work and did not report to work for defendant Town. Chief Laughren had instructed plaintiff not to report to work that day because she had worked five consecutive days and he believed that she needed a day off. Additionally, Chief Laughren knew that plaintiff had been working as a volunteer with defendant Rescue Squad during the evenings. Chief Laughren had scheduled sufficient personnel to cover plaintiffs absence on 22 September 1999.
14. During the afternoon of 22 September 1999, plaintiff went to the Yaupon Beach Fire Station to assist for a short period of time. She then went home before returning to the fire station at approximately 9:30 p.m. No one had specifically instructed plaintiff to assist with the activities being performed at the fire station on that date or any prior date. Plaintiffs emergency management activities performed after her shift for defendant Town were performed in a volunteer capacity and not as an employee of defendant Town.
15. Upon arriving at the station in the evening of 22 September 1999, plaintiff met and ate dinner with Ms. Christy Snapp and Mr. Michael Gregory, a Lieutenant and Captain of the Yaupon Beach Volunteer Fire Department, respectively. She also met Specialist Reece Penland of the North Carolina National Guard. Mr. Gregory informed plaintiff that an individual named John Milan wanted plaintiff and the others to go with him on a patrol. Mr. Milan had not yet come to the station.
16. Specialist Penland offered to take plaintiff, Mr. Gregory and Ms. Snapp with him on patrol in his HMMWV. The group agreed to go with Specialist Penland, and they left the station in the HMMWV at approximately 10:30 p.m.
17. Plaintiff had ridden in the National Guards HMMWVs on prior occasions and enjoyed doing so. The group drove to the beach strand, entering onto the beach near the Yaupon Beach pier. They then proceeded along the beach in an eastward direction toward Caswell Beach. As they were proceeding along the beach strand, they encountered a small group of people who were watching the beach for sea turtles. Specialist Penland instructed the group to leave the beach because of the curfew. Specialist Penland and his passengers then proceeded eastward, entering the geographical limits of Caswell Beach. After they reached the end of the beach, Specialist Penland turned the HMMWV around and began driving back toward Yaupon Beach. While still within the geographical limits of Caswell Beach, Specialist Penland began driving at an unsafe rate of speed.
18. Due to the unsafe rate of speed, the HMMWV flipped or rolled over. Specialist Penland was killed in the crash. Plaintiff, Ms. Snapp, and Mr. Gregory all sustained severe injuries.
19. At the time of the accident, Specialist Penland, plaintiff, and the other passengers were not responding to any specific call for assistance and were not delivering food or water. When plaintiff and the others agreed to ride with Specialist Penland, no specific emergency management activities were taking place at the Yaupon Beach Fire Station, and the group was bored because there was nothing to do at the station. Plaintiff went on patrol with Specialist Penland because riding in a HMMWV was fun and she was not needed elsewhere at the time. Nevertheless, on the evening of 22 September 1999, plaintiff, as a volunteer emergency management worker, made herself available at the fire station to do what was necessary to assist in the continuing recovery effort. At the time of the accident, she was participating in a National Guard patrol and was available during the patrol in the event that emergency management services were needed.
20. Defendant Town did not instruct or expect plaintiff to volunteer in the evenings after work. Plaintiff did not offer her services as a volunteer at the direction of defendant Town or, specifically, Chief Laughren. Plaintiff did not expect or request payment from defendant Town for her volunteer activities during the evenings. Chief Laughren specifically instructed plaintiff not to report to work on 22 September 1999. At oral argument before the Full Commission, plaintiffs counsel conceded that plaintiff was not "on the clock for defendant Town; rather, counsel took the position that, at the time of her injury, plaintiff was a volunteer employee of defendant Rescue Squad.
21. On 22 September 1999, plaintiff performed emergency management services for defendant Rescue Squad by virtue of her status as an honorary member who volunteered for and was accepted for active duty during a state of emergency and continuing exigent circumstances following Hurricane Floyd. Plaintiffs activities at the time of her injury were in furtherance of defendant Rescue Squads mission. Plaintiffs after hours volunteer activities benefited the Rescue Squad and the Town.
22. On 22 September 1999, plaintiff was a volunteer member of defendant Rescue Squad, subject to the order and control of defendant Rescue Squad, which is a volunteer arm of defendant Towns emergency services program.
23. The same workers compensation policy covers employees of defendant Towns emergency services employees and volunteer members of defendant Rescue Squad.
24. Pursuant to a Form 22 Wage Chart filed 3 July 2000, plaintiffs Average Weekly Wage at the time of her injury was $486.64, yielding a weekly compensation rate of $324.45.
25. Plaintiffs counsel is entitled to a reasonable attorneys fee of twenty-five percent of the compensation due plaintiff.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following additional:
 CONCLUSIONS OF LAW
1. The "North Carolina Emergency Management Act, defines an emergency management worker as including "any full or part-time paid, volunteer or auxiliary employee of this State . . . performing emergency management services at any place in this State, subject to the order or control of or pursuant to a request of the State government or any political subdivision thereof. At the time of her injury by accident on 22 September 1999, plaintiff was an "emergency management worker performing emergency management functions. G.S. 166A-4(1), 166A-14(d).
2. G.S. 166A-14 provides:
. . . (b) The rights of any person to receive benefits to which he would otherwise be entitled under the Workers Compensation Law shall not be affected by performance of emergency management functions.
 . . . (e) Any emergency management worker, as defined in this section, performing emergency management services at any place in this State pursuant to agreements, compacts or arrangement for mutual aid and assistance to which the State or a political subdivision thereof is a party, shall possess the same powers, duties, immunities and privileges he would ordinarily possess if performing his duties in the State, or political subdivision thereof in which normally employed or rendering services.
At the time of her injury on 22 September 1999, but for the Emergency Management Act, plaintiffs activities would not arise out of or in the course of her employment with defendant Town of Oak Island. At the time of her injury, however, plaintiffs activities arose out of and in the course of her activities as a volunteer member of defendant Long Beach Rescue Squad. Plaintiff is entitled to the same workers compensation benefits to which she would be entitled had she been injured in the course of her employment with defendant Town. G.S. 97-2(6); G.S.166A-14(b).
3. Plaintiff sustained an injury by accident arising out of and in the course of her activities as an emergency management technician. As a direct result of her injuries, plaintiff is totally disabled and is entitled to indemnity compensation in the weekly amount of $324.45, beginning 22 September 1999 and continuing until further order of the Commission. G.S. 97-2(6), 97-29.
4. Plaintiff is entitled to payment of all medical expenses incurred as a result of her injuries on 22 September 1999. G.S. 97-25, 97-25.1.
5. When plaintiff reaches maximum medical improvement, she may be eligible for compensation based upon any permanent partial disability she may have sustained. Accordingly, this issue is reserved. G.S. 97-31.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant Town shall pay plaintiff weekly indemnity compensation in the amount of $324.45, beginning on 22 September 1999 and continuing until further order of the Commission. Any accrued amount shall be paid in a lump sum, subject to attorneys fees provided in this Award.
2. Defendant Town shall pay plaintiffs past and future medical expenses for treatment related to her injury.
3. Defendant Town shall pay directly to plaintiffs counsel 25% of the accrued portion of the Award, and every fourth weekly payment thereafter shall be paid directly to plaintiffs counsel.
4. Defendant Town shall bear the costs.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER